# Morris & Morris *v.* Tuskaloosa Manufacturing Co.

*Bill in Equity for Injunction, in nature of Specific Per-
formance.*

1. *Injunction in nature of specific performance.*—An injunction is the
proper remedy to enforce against a purchaser of land, or sub-purchaser
with notice, in favor of the vendor or his assigns of the dominant estate,
a covenant running with the land, or a valid restriction imposed by deed
on the use of the part sold.

2. *Covenants running with land, or restricting use of part sold for resi-
dence only.*—An express stipulation and reservation in a conveyance of
land, part of a larger tract owned in fee by the vendor, that it shall be
used as a residence only, and not for carrying on any trading or mer-
cantile business, is not contrary to public policy, nor otherwise illegal;
and a court of equity will enforce it against the purchaser, or a sub-
purchaser with notice, in favor of the vendor, or of a private corporation
which has succeeded to his estate, although it may have no power to
engage in a mercantile business.

APPEAL from the Chancery Court of Tuskaloosa.

Heard before the Hon. THOMAS COBBS.

The bill in this case was filed on the 9th December, 1886,
by the Tuskaloosa Manufacturing Company, a private corpo-
ration organized under the general statutes, against Joseph
Morris and Joseph Morris, Jr., partners in trade doing busi-
ness under the firm name of Morris & Morris; and sought
to perpetually enjoin the defendants from carrying on a mer-
cantile business in the house and lot occupied by them, which
they had bought from one W. L. Cree, and which was part
of a large tract of land once owned by Baugh, Kennedy &
Co., from whom the complainant also derived title to its

[Morris & Morris v. Tuskaloosa Manufacturing Co.]

lands. The case was submitted for decree on an agreed statement of facts, as follows:

"In 1875, and for several years prior thereto, Baugh, Kennedy & Co., a partnership composed of" five persons named, "were the owners of a large tract of land containing about 2,000 acres, situated in Tuskaloosa county, about eight miles north-east of the city of Tuskaloosa, and lying on both sides of the Alabama Great Southern railroad. A station on said railroad, then called Kennedale, now Cottondale, was located on said lands; and Baugh, Kennedy & Co. owned all the lands within a half-mile of said station, or depot. This depot was, and is, the only one on the line of said railroad, for a distance of more than ten miles north of Tuskaloosa; and it is the shipping point for a large extent of country, for which it is also the place of trade, or market town; and it is therefore an advantageous sight for mercantile business. The town of Cottondale, situated at said station, is a village of several hundred inhabitants. Baugh, Kennedy & Co. owned and operated a cotton-mill near said depot, and also carried on a general mercantile business in a house in said town at or near said mills; and they were accustomed to sell goods to the employees in said mills, giving orders on the store as a matter of convenience to both parties.

"In 1875, said firm sold to W. L. Cree a lot in the town of Cottondale, which is the same as that now occupied by defendants, and the use of which is the matter of controversy in this suit. The sale of said lot to Cree was made subject to the restriction, that no mercantile business should be carried on thereupon; and similar restrictions were made upon the use of all the other lots sold by them, six or seven in number; their object and purpose being to protect their own mercantile business from competition, and secure for it the entire trade of said village. No deed was made at the time of the sale to Cree, nor was any writing drawn up expressing the terms of the contract; but a deed was agreed to be made, and Cree went into possession of the lot, built a house thereon, and paid the purchase-money. The deed marked 'Exhibit E,' dated December 10th, 1875 [referred to in the opinion of the court], was afterwards executed by said Baugh, Kennedy & Co., containing the reservations and restrictions agreed on, and was filed by them in the office of the probate judge of the county. Said firm became bankrupt on the 1st July, 1876. Prior to its bankruptcy, to-wit, on the 29th June, 1876, one of the members of said firm signed and acknowl-

edged said deed to Cree, in the firm name, and filed it for record as above stated. Cree was at the time in possession of the lot, and was informed that a deed had been made to him by the firm; but the deed was not delivered to him, and he had never seen it, nor any copy of it, until it was made an exhibit to the bill in this case. Said deed was never recorded, but, after having been filed for record, was withdrawn from the office, by what agency is unknown. Cree had knowledge that the deed would be executed, and made inquiries of said firm as to whether it had been executed, several times requesting its execution and delivery.

"On the bankruptcy of said firm, the storehouse owned by them was closed, and their mercantile business discontinued; and the assignees in bankruptcy, in August, 1876, soon after their appointment, sold out the stock of goods in the house, at auction, in the city of Tuskaloosa. Said storehouse remained closed, and no mercantile business was carried on therein, nor on any of the lands owned by said firm, until a store was opened by complainant more than a year after said auction sale.

"Complainant was incorporated, under the general statutes for the incorporation of business and manufacturing corporations, on the 16th August, 1877, a copy of the papers relating to the incorporation being made an exhibit to the answer. Soon afterwards, to-wit, on the 29th August, 1877, at a sale of the lands and mills of said firm, made by the assignees in bankruptcy, complainant purchased the same, and received a deed from the assignees, as shown by 'Exhibit D;' the lands conveyed including the entire village of Cottondale, for over a quarter of a mile from the factory, the company's storehouse (leased to one Thompson), and the lot here in controversy. Notice was given at said sale, by said assignees, that said lot sold to Cree was not included in the lands offered for sale; nor was any personal property at that time sold by said assignees. Notice was also given at said sale, by said Cree, of his claim to said lot, and he was then in the actual possession thereof; and on the 27th November, 1879, he received a deed to said lot from said assignees in bankruptcy, shown by 'Exhibit A' to the bill.

"In November, 1883, Joseph Morris, one of the defendants, purchased said lot from Cree, receiving a conveyance, which is made 'Exhibit C' to the bill; and in November, 1886, he opened a mercantile business in a storehouse erected thereon. Said Morris knew of the deed by the assignees in

bankruptcy to Cree, but had no other notice of said deed from Baugh, Kennedy & Co., except information from Cree that he had been told a deed had been made to him, and such constructive notice, if any, as was imputed by the filing of the same for record; and he also had information that the sale of the lot to Cree by Baugh, Kennedy & Co. was made subject to the restriction as to the use of the lot for mercantile purposes. Complainant opened a mercantile business in Cottondale, within six months after its incorporation, and carried on the same for several years in its own name; and for several years past it has leased the storehouse at a large rental, and with a stipulation that no other store should be opened or carried on in said village, than that of its lessee. No other store has been opened in Cottondale, in opposition to that of the complainant, except that of defendants; and defendants' business competes with that carried on by complainant's lessee. Complainant has never sold any of the lands acquired under the deed from said assignees in bankruptcy, and is the owner of all the lots in the village except the seven or eight sold, as above stated, by Baugh, Kennedy & Co. Complainant has built houses on some of said lots, and derives profits from the rent of the same; renting both to its employees and others, but always giving the preference to its employees. The land contains timber and wood, which is useful and necessary as fuel for the use of the employees, and for carrying on their business; wood being often used in connection with coal, in generating the steam power needed to propel their machinery. Much coal also underlies the adjacent lands owned by the complainant, which they are accustomed to mine, and much of which they use in carrying on their business, the amount annually used being worth between $5,000 and $6,000. The rental value of the complainant's said store is greatly enhanced by the fact that no other store is permitted on the company's lands. Said storehouse is within two hundred yards of the factory, and convenient to the houses occupied by most of the employees; and the complainant has long been accustomed to give the employees orders on the lessee of the store, for goods and merchandise used by them, which are honored by said lessee on the credit of the company; and these orders, or tickets, are redeemed by the complainant about once a week. There is a prohibitory liquor law in existence, prohibiting the sale or giving away of spirituous liquors within two miles of said factory, or store."

The chancellor overruled a demurrer to the bill, and, on final hearing on pleadings and proof, rendered a decree for the complainant, perpetuating the injunction; and this decree is now assigned as error.

HARGROVE & VAN DE GRAFF, and COCHRAN & FITTS, for the appellants.—The appellants do not impugn the doctrine asserted in *Webb v. Robbins* (77 Ala. 176), and followed in *McMahon v. Williams* (79 Ala. 288)—that a vendor or grantor, in making a sale of real estate, may retain an easement or servitude in the lands sold, when not in general restraint of trade, nor contrary to public policy; but they contend that the reservation here sought to be enforced is both contrary to public policy, and in general restraint of trade. The relief sought is in the nature of specific performance, which is not a matter of legal right, but of grace only, and rests in sound equitable discretion.—1 Waterman on Spec. Performance, § 6; *Gould v. Womack*, 2 Ala. 83; *Dial v. Hair*, 18 Ala. 798; *Blackwilder v. Loveless*, 21 Ala. 371; *Gentry v. Rogers*, 40 Ala. 442; *Andrews v. Andrews*, 28 Ala. 432. As between the original grantors and grantee, the reservation sought to be enforced is in the nature of a monopoly, which is always regarded as hostile to the rights and interests of the public. The restriction is not confined to selling goods and merchandise, but extends to every other business or occupation that might be carried on, within an area of more than two thousand acres, now the site of a village containing several hundred inhabitants; leaving them the nominal owners of their respective dwellings, but at the mercy of the grantor for the means of subsistence. And this monopoly is sought to be enforced by a corporation, which has acquired the lands of the grantor by purchase at bankrupt sale, but can not carry on any of the different occupations, or kinds of business, which may be necessary or convenient for the people, but which can only be carried on by its lessees, at their expense, and to the profit of their employer.—*Alger v. Thacher*, 31 Amer. Dec. 121, or 19 Pick. 51; *Craft v. McConaughy*, 79 Ill. 346, or 22 Amer. Rep. 171; *Arnett v. Coal Co.*, 68 N. Y. 558, or 23 Amer. Rep. 190. A corporation can not enforce a contract, or recover an interest in lands, when it is not necessary for carrying into effect some power or purpose for which the corporation was created.—*Wilks v. Ga. Pac. Railway Co.*, 79 Ala. 180, and cases there cited; also, *Grangers' Insurance Co. v. Kamper*, 73 Ala.

325; *Chambers v. Falkner*, 65 Ala. 448; *Machine Co. v. Wilkinson & Cole*, 79 Ala. 312; 1 Stew. 299; *Packet Co. v. Shaw*, 19 Amer. Rep. 784; 28 La. Ann. 173; *Nav. Co. v. Dandridge*, 29 Amer. Dec. 543. Considerations of public policy, and the changed circumstances of the parties and of the country, require that the relief asked should not be granted.—*Columbia College v. Thacher*, 87 N. Y. 311, or 41 Amer. Rep. 365; *Folls' Appeal*, 91 Penn. St. 434, or 36 Amer. Rep. 671; *Alger v. Thacher*, 19 Pick. 51; 2 High Inj. § 1158; Waterman on Spec. Perf., § 116; Washb. Easements, 747.

WOOD & WOOD, *contra*, cited *Webb v. Robbins*, 77 Ala. 176; *McMahon v. Williams*, 79 Ala. 288; *Gilmer v. Railway Co.*, 79 Ala. 569; 36 Beav. 16; 6 Lea, 283; 52 Ind. 16; *Parkman v. Aicardi*, 34 Ala. 393.

STONE, C. J.—Baugh, Kennedy & Co., copartners, owned a large tract of land in the country, on which they had erected and were operating cotton-mills, a private enterprise. They sold to one Cree a half acre of their lands, described by metes and bounds—the contract of sale expressing certain reservations in the grantors. Two deeds to Cree are found in the transcript. The first bears date December 10, 1875, and purports to have been executed by Baugh, Kennedy & Co. in their partnership name. It is, in form, an ordinary deed of bargain and sale, with covenants of warranty implied from the words "grant, bargain, sell and convey." It contains this condition in the *habendum* clause, declared to be "absolute and perpetual, viz., that said lot is to be used by the party of the second part [Cree], his heirs and assigns, as a residence only, and not for the purpose of a trading-house, or house or place for the sale of groceries, liquors, or merchandise of any kind or description whatever." This paper, perhaps, failed to convey the legal title, for more reasons than one, but we need not specify them.

Baugh, Kennedy & Co. became bankrupt, and their assignees, reciting that Cree had paid the purchase-money, ten dollars, to the said Baugh, Kennedy & Co., conveyed the lot to Cree by quit-claim deed, bearing date in 1879. That deed contains "the following conditions and reservations: the said lot or parcel of land to be used by said vendee only as a residence, or homestead, and not otherwise; and in particular, no mercantile transaction, or other business by any

person occupying the same." Cree, by deed without cove-
nants, dated in 1883, conveyed the lot to Morris, one of the
appellants, who, in company with his son, commenced to do
a mercantile business on the lot.

The lands on which the cotton-mills were situated—the
entire tract which had been of the estate of Baugh, Ken-
nedy & Co.—together with everything connected with the
manufacturing enterprise, were sold at bankrupt sale, and a
company became the purchasers, and received the convey-
ance. They thereupon incorporated themselves under the
name of the "Tuskaloosa Manufacturing Company," and are
now operating the mills in that name. The present bill,
filed by the corporation, prayed and obtained an injunction
against Morris & Morris, restraining them from conducting
a mercantile business on said lot; and at the hearing, the in-
junction was made perpetual. From that decree the present
appeal was prosecuted. The sole question is, whether the
reservation in the deed should be enforced by injunction.
The attack is made on the right, not on the remedy; for, if
the right be conceded, and its enforcement be not against
public policy, there is no question that injunction is the only
redress which is efficient and adequate.—*Parkman v. Aicardi*,
34 Ala. 393; *Webb v. Robbins*, 77 Ala. 176; *McMahon v.
Williams*, 79 Ala. 288.

The following facts are clear and indisputable: Baugh,
Kennedy & Co. owned the lands in fee. Both parties to this
controversy claiming derivatively from them, each is estopped
from disputing their title. Owning the land in fee, they
could not be compelled to sell or dispose of it, except by the
assertion of the right of eminent domain, not pertinent to
this case, nor claimed to be. Having the right to sell, that
company could sell and convey a fee, or less than a fee; and
the quantum of interest they would sell and convey, must, of
necessity, have depended on the agreement they and the pur-
chaser might make. They sold and conveyed a title limited
in its use, with a restriction that it should not be employed
as a place for the sale of merchandise. The purchaser ac-
cepted the conveyance, with this limitation imposed on his
right of use. He can not complain, for he purchased and
paid for only a qualified use. And the limitation being ex-
pressed in the face of his title, all men coming in under him
are charged with knowledge of it.—*Johnson v. Thweatt*,
18 Ala. 741; *Dudley v. Witter*, 46 Ala. 664. The benefit
of this reservation, or servitude, follows the lands of the

seller—the dominant estate—into whose hands soever it may pass, and against any and all persons who succeed to the servient estate, with notice, actual or constructive, of the limitation or servitude resting upon it.—Washb. Easements, (4th. Ed.) 37; *Webb v. Robbins*, 77 Ala. 176; *McMahon v. Williams*, 79 Ala. 288.

The real contention in this case is, that the reservation or limitation was incorporated in the deed for the purpose of retaining in the manufacturing company a monopoly in the sale of merchandise; that such monopoly is contrary to public policy, and that the court of chancery, which is a court of conscience, will not lend its aid to the perpetuation of such a scheme. The authorities mainly relied on in support of this argument are, *Trustees of Columbia College v. Thacher*, 87 N. Y. 313; s. c., 41 Amer. Rep. 365; and *Foll's Appeal*, 91 Penn. St. 434; s. c., 36 Amer. Rep. 671. In the first of these cases, two land proprietors owned adjacent lands in the city of New York. The lands were high up town, beyond the range of business enterprises, and were well adapted to family residences. For mutual benefit they entered into a covenant, one with the other, "that only dwelling-houses should be erected thereon, and not to carry on, or suffer any kind of manufactory, trade, or business thereon." There does not appear to have been any inducement to this contract and covenant, save the profit or comfort each was expected to derive from its observance, nor any consideration, other than the mutual agreement of the parties. No change of property took place, and neither acquired lands from the other. It was, at most, only an interchange of an easement or servitude each landholder imposed on lands previously owned, and still retained by him. In the growth of the city, business enterprises pressed upon the lands embraced in the covenant, and an elevated street railway was constructed, which passed the premises, and rendered them much less desirable as sites for private residences. A bill was filed by one of the parties to the covenant, to hold the other to its observance. Relief was denied, on the ground of the changed conditions. Among other things, the court, quoting many authorities, said: "Though the contract was fair and just when made, the interference of the court should be denied, if subsequent events have made performance so onerous, that its enforcement would impose great hardships upon him, and cause little or no benefit to plaintiff."

One marked difference between that case and the one we

[Morris & Morris v. Tuskaloosa Manufacturing Co.]

have in hand is, that while, in our case, no change of condition is claimed, in that very great changes had taken place, and the ruling was based mainly on the change.

The case of *Foll's Appeal, supra,* was properly disposed of. Many reasons may be urged why relief should not have been granted in that case, not the least potent of which is the fact, that the purpose and prayer of the bill were to obtain specific performance of an executory contract for the purchase of bank-stock, a species of personal property. The court denied relief, because it appeared that the object of the purchase was to obtain control of the bank—a national bank—by becoming owner of a majority of the stock. The court said: "While the legal right of the complainant to buy up sufficient of the stock of this bank to control it in the interest of himself and friends may be conceded, it is by no means clear that a court of equity will lend its aid to help him. A national bank is a *quasi* public institution. While it is the property of its stockholders, and its profits enure to their benefit, it was nevertheless intended by the law creating it that it should be for the public accommodation." We might further extend the quotation, but consider it unnecessary. The decision might have been safely placed on the single ground, that the bill prayed the specific performance of a contract for the sale of personal property, and gave no special reason of merit why the general rule in such cases should be departed from. Equity will not, in general, decree the specific performance of contracts concerning chattels, unless such chattels have some "special value to the owner," or are "unique, rare, and incapable of being reproduced in money."—3 Pom. Eq. §§ 1401–2.

Neither of these cases, in our judgment, sustains the position taken by appellant's counsel. Neither of them presents the case of a purchase of a partial, qualified, or restricted interest in realty, taking possession under a conveyance containing reservations, and afterwards throwing off the restraints and maintaining a right to the unqualified use. Nor have we been referred to any case which asserts that doctrine. To recognize such doctrine, would be to place a very dangerous restraint on the power of alienation, which is supposed to be inherent in the ownership of property. In the cases of *Webb v. Robbins,* and *McMahon v. Williams, supra,* the same complaint of monopoly might have been urged as in this case. Yet, in each of those cases, we granted relief to the successor of the grantor, giving full effect to the ease-

ment or servitude, reserved to the grantor in the contract and conveyance. And Pomeroy, vol. 3, § 1342, says, that "restrictive covenants in deeds, leases and agreements, limiting the use of land in a specified manner, or prescribing a particular use, which create equitable servitudes on the land, will be specifically enforced in equity by means of an injunction, not only between the immediate parties, but also against subsequent purchasers with notice, even when the covenants are not of the kind which technically run with the land." *Sprague v. Snow*, 4 Pick. 54; *Cowdry v. Colburn*, 7 Allen, 9; *Parker v. Nightingale*, 6 Allen, 341; *Hubbell v. Warren*, 8 Allen, 173; *Brewer v. Marshall*, 4 C. E. Green, 543; Washb. Easements, 114–5, *et seq.*

In what we have said above, we have founded the complainant's right to relief on the reservations expressed in the deed to Cree, and have held that it imposed an infirmity and easement on the half-acre sold, in favor of the owner of the estate out of which it was carved. We have also held, that the reserved power and right followed the lands, into whose hands soever they have passed, and fastened the infirmity and easement on any and all persons who acquired title under Cree, the original grantee. We have not considered, and do not consider, whether the Tuscaloosa Manufacturing Company, a private corporation, has the power under its charter of engaging in a mercantile adventure. The absence of right in the defendants is fatal to their asserted claim, and the reserved rights of the grantors and their successors to have the servitude respected and enforced is none the less availing, even if it be shown that by incorporation the manufacturing company has lost all power to engage in selling merchandise. Denying power to one, does not confer it on the other.

Affirmed.

SOMERVILLE, J., not sitting.